E-FILED
Tuesday, 07 June, 2005  02:52:55 PM
Clerk, U.S. District Court, ILCD

United States District Court
Central District of Illinois

FILED
JUN - 6 2005
JOHN M. WATERS, Clerk
U.S. DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS

Larry Young
 Plaintiff

vs

Rod Blagojevich et al
 Defendants

Case 03-1273

To Clerk

Motion For Appointment of Counsel
Support Discovery Deposition

Now Come Plaintiff who had been diagnosed as Schizophrenic with Broken Arm And was Receiving "SSI" (Supplemental Security income) For The Conditions

Larry Young
P.O Box 99 B01435
Pontiac Correction Center

Date 6-2-05

Oral Argument Requested

United States District Court
Central District of Illinois

Larry Young
 Plaintiff
  vs
Rod Blagojevich
 Defendants

Case 03-1273

to Check

Motion for Appointment of Counsel
with Support Discovery Deposition

Now Come Plaintiff Larry Young disabled by "Schizophrenic" and "Broken Arm" since 1991 in 1993 An Administrative Law Judge ("ALJ") who Conducted a hearing and reviewed the evidence by 1993 Appoint Psychiatrist had diagnosed Plaintiff Larry Young Schizophrenic with Broken Arm. Certified psychologists and Physicians qualifies as an Acceptable Source that meet the "Criteria" for Appointment of Counsel Plaintiff Larry Young Further Requests that Counsel be required to read 03-1362 Discovery Deposition Medical Records The Complaint on August 20 2003 and Amend the Complaint if Necessary Plaintiff is without any source of income or assets to pay Requested postage Mail Defendants engages in unfair deceptive Acts an Practices, Refusing proper Medical

care that is denial of Medical Treatment for the purpose of causing punishment and "Pain" See January 18th 2000 Merit Review hearings Larry Young v Department of Corrections 99-1157, 99-1127 99-1232 These three Cases Are Consolidated For purposes of the hearing "Schizophrenic expressed as disorder with Broken Arm cause in Pontiac Correctional Center 1991 Schizophrenic - Schizophrenically See definitions Merriam - Webster's Collegiate Dictionary Tenth Edition The Plaintiff Larry Young has no right to Counsel See Merritt v Faulkner 697 F.2d 761, 763 (7th Cir 1983) The decision To Appoint Counsel lies within The broad "discretion" of the Court A Appoint Counsel is responsible to Show Plaintiff's Conditions ("Schizophrenic") with Broken Arm that didn't healed Is Severe That Plaintiff's Conditions meet or equals a disability listed in SSA regulations. Though regulation 12.06 Anxiety Related Disorder The regulation does not Specifically mention "Schizophrenic" Appoint Counsel will have to demonstrate by Medical reports and expert Testimony that Broken Arm didn't healed and Conditions are severe as exercising its discretion The inability to investigate Crucial Fact The evidence denied Proper Medical Treatment indicates that The Truth

will more likely be exposed if both sides are represented by counsel See Larry young v. DAVID AHLEMEYER et al CASE NO # 04-1260 10-20-2004 "Appear By Video" Broken Arm didn't healed Pain and deform Cause Pain and Punishment Defendant Rod Blagojevich personally responsible The Governor, executive Agencies Coverup deliberate indifference Pain Administrative Approval improper Administrative Review Board Agency head Signature on All Grievance Section 504.840 Emergency Procedures with Broken Arm A Committed person may request A grievance be handled on An Emergency basis by forwarding the grievance directly to the Chief Administrative Officer A Broken Arm denied proper Medical treatment A Substantial risk of imminent personal injury Broken Arm "Serious" irreparable harm Chief Administrative Never respond to Plaintiff Committed person within 3 days After receipt Source: Amend at 22 Ill reg 1206 effective January 1, 1998. Defendant Judy Ellinger who coverup 1991 Assaulted fail to provide Medical Care who is personally responsible for Med Tech See Discovery Deposition of Larry young Case No 03-1362 Coverup cause Pain and Punishment

Respectfully Submitted
Pro Larry young

# CERTIFICATE

I LARRY YOUNG who was diagnosed Schizophrenic with Broken Arm, was recieving "SSI" (Supplemental Security income)] For Conditions PLAINTIFF Larry Young hereby Certifies That he Served A Copy of Foregoing Motion For Appointment of Counsel with The Discovery Deposition of PLAINTIFF CASE NO 03-1362 Upon LISA Madigan Attorney General 100 West Randolph St 12th Chicago Illinois 60601

LARRY YOUNG #B01435
PONTIAC. Correctional Center
P.O Box 99 700 W Linedast
PONTIAC ILL 61764.

Respectfully Submitted
Larry Young
PLAINTIFF

Date 6-2-05

1

UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
PEORIA DIVISION

LARRY YOUNG,                )
                            )
    Plaintiff,              )
                            )
        vs.                 )   No. 03-1362
                            )
CRAIG FINDLEY, et al.,      )
                            )
    Defendant.              )

   THE DISCOVERY DEPOSITION OF LARRY YOUNG, reported by Lisa J. Doerr, Illinois CSR 084-004304, on Wednesday, the 3rd day of November, 2004, commencing at the hour of 1:30 p.m. at 700 West Lincoln Street, in the City of Pontiac and State of Illinois.

## Page 2

APPEARANCES:

MR. CHRISTOPHER HIGGERSON
ASSISTANT ATTORNEY GENERAL
500 South Second Street
Springfield, Illinois 62706
(217) 785-9096
  appearing on behalf of the State of Illinois;

MR. MATTHEW R. BOOKER
HEYL, ROYSTER, VOELKER & ALLEN
1 North Old State Capitol Plaza, Suite 575
P.O. Box 1687
Springfield, Illinois 62705
(217) 522-8822
  appearing on behalf of Dr. Funk.

### INDEX

WITNESS                                         Page

LARRY YOUNG

Examination by Mr. Higgerson          3
Examination by Mr. Booker             26
Further examination by Mr. Higgerson  40

EXHIBITS

(None marked.)

## Page 3

LARRY YOUNG,

having been first duly sworn was examined and testified as follows:

EXAMINATION
BY MR. HIGGERSON

Q. Would you state your name, please.
A. Larry Young.
Q. Mr. Young, I don't know if you understood what happened the other day in our status conference, but Judge Baker has struck everything in this case, and it is giving you an opportunity at this point to clarify the cause of action you're trying to bring. And his method of doing that at this point is, he's instructed us to depose you and find out what exactly is your claim in this case. Now, you have several cases that you filed right now; is that right?
A. Huh?
Q. You have several cases still ongoing at this point; is that right?
A. Yes.
Q. The case we're talking about today is Larry Young

## Page 4

    versus Birkel, et. al., which is 03-1362?
A.  Right.
Q.  Okay. You're --
A.  Is it all right if I can take that out of here?
Q.  Yes.
A.  I can't take it out.
Q.  Is there something I can do that would help?
A.  Just take it all out. Okay. That's it.
Q.  Okay. In your complaint you reference an assault in 1991; is that right?
A.  Uh-huh.
Q.  I'm sorry, you have to say yes or no so she can take it down.
A.  Yes.
Q.  Who do you allege assaulted you in 1991?
A.  Who broke my arm? It was -- his name was Dallas but -- his name was -- it's Lieutenant Dallas, he's a lieutenant now. He works here. He broke my arm.
Q.  Was anybody else involved in the assault?
A.  Yeah, there were four more, about four or five more officers. He was the lead officer. He was the one that broke it. They all followed him when he came to my cell.

## Page 5

Q.  Do you know who those other four officers were?
A.  I don't remember. I remember him, though. One of them -- I'm trying to see his face. I don't remember.
Q.  Was this part of a cell extraction?
A.  He came and took my walking cane. I had a walking cane.
Q.  But were they -- were they the tactical team at the time?
A.  They didn't have a tactical team. They just came in with a shield.
Q.  They were in their regular uniforms?
A.  Uh-huh.
Q.  Which in 1991 would have been the dark green pants and either light green or white shirt?
A.  Uh-huh.
Q.  You have to say yes or no.
A.  Yes. It was green. It was a green uniform.
Q.  Okay. And one of them had a plastic shield?
A.  Lieutenant Dallas was the one.
Q.  And when they came into your cell, you said what occurred after that was an assault and your arm was broken?

**Page 6**

1  A. Yeah, because I had my cane in my hand and I cuffed
2     up from the front. They didn't cuff up from the
3     back then. So when they came in, you know, he
4     rushed and got ahold of my arm, and I tried to
5     protect myself.
6  Q. Do you remember when in 1991 that happened?
7  A. November or December. I don't remember.
8  Q. Did you file a grievance regarding --
9  A. Yes, I did.
10 Q. Okay. Do you remember what the result of that
11    grievance was?
12 A. No. There wasn't a result. They tried to -- they
13    tried to get me to make a -- to take a lie detector
14    test. I refused.
15 Q. You refused to take a lie detector test?
16 A. Yeah.
17 Q. Was your grievance then denied?
18 A. I don't remember. I -- because I never heard the
19    grievance, because, see, after then I started
20    getting good time and stuff and got on parole
21    June 1st, '92, because I had a surgery on my arm.
22    And they left a cast -- well, they seen it was
23    broken and they put a cast on my arm until -- the

**Page 7**

1     cast stayed on my arm until February. I had
2     surgery -- yeah, February. Then I had surgery on
3     it because when they took the cast off it was still
4     broke. So they did surgery on it.
5  Q. Okay. But the grievance that you filed, did you
6     ever receive it back with a decision written on it?
7  A. No. No, I didn't, because I paroled in '92, June
8     the 1st, '92. I had surgery in February.
9  Q. You were released from prison --
10 A. In June.
11 Q. -- in June of '92?
12 A. June '92. I had a broke hip and a broke arm when I
13    left this joint.
14 Q. Okay. After you were released, did you file a
15    lawsuit regarding this assault that alleged -- that
16    resulted in the broken arm?
17 A. I filed a lawsuit before I left. I put in a
18    complaint -- well, I couldn't write at the time,
19    but somebody else wrote it for me, and they put it
20    in. But --
21 Q. You filed a lawsuit, I assume, in 1991?
22 A. Yep. Filed before I left the joint, '91 or '92, I
23    think, because it said filed on -- on -- on the

**Page 8**

1     complaint. It had filed on it.
2  Q. Did you file that in the Central District of
3     Illinois in Federal Court?
4  A. Uh-huh. I think so, because it came back.
5  Q. What happened to that lawsuit?
6  A. I was trying to get -- I tried to notify them and
7     they didn't never say anything about it. I was at
8     home. I wrote that I had -- I wrote, I went home.
9     And I had a broke hip at the time, so I went to the
10    hospital, UIC, in Chicago, because I had been going
11    to UIC from here for my hip. And they the one that
12    gave me a permit for my -- for my cane. So they
13    did surgery me on my -- on my hip. I had a hip
14    replacement. And I explained to them I had a
15    broken arm, too, but they had did surgery on it,
16    but it still broke. They told me they have to do
17    one thing at a time.
18 Q. You don't know what happened to the lawsuit you
19    filed either in late 1991 or early 1992?
20 A. No. I tried -- I asked about it, but they said
21    something -- see, like, I was, um, on disability.
22    I had they had declared me disabled. They put me
23    on SSI in '93. So I had a pain or something, so I

**Page 9**

1     never did -- I explained it to the lawyers, but I
2     -- they never would give me the records and stuff,
3     so I couldn't -- you know, I couldn't explain --
4     let them know how my arm had broken, you know. But
5     they said it was still broke.
6  Q. How long were you out after you were released in
7     June of 1992?
8  A. How long was I out?
9  Q. Yes.
10 A. I was out until '97. I got -- I came back -- I got
11    locked up in '97.
12 Q. So it was approximately five years that you were
13    out?
14 A. Yep.
15 Q. Did you file any other lawsuits during those five
16    years regarding this broken arm in 1991?
17 A. Yeah. I -- when I was in Stateville I filed a
18    complaint and told them that my arm was still
19    broke, but they -- they sent me something back
20    saying -- I think they said statute of limitation
21    had run out.
22 Q. Was that in the Northern District of Illinois?
23 A. Uh-huh.

**Page 10**

1  Q. I'm sorry, was that a yes?
2  A. Yeah. If I was in Stateville, I just -- you know,
3     I'm assuming it was.
4  Q. And when -- this was after you got back in, in
5     1997?
6  A. Yeah, because I -- after I got back in, I told them
7     in receiving that my arm was still broke.
8  Q. Okay.
9  A. I couldn't cuff up, you know, from behind my back.
10 Q. Okay. But in 1997 when you filed suit about this
11    broken arm, the court told you that the statute of
12    limitations had expired, you couldn't file the
13    suit; is that right?
14 A. Yeah. Well, they -- I sent a letter to them
15    letting them know that I was locked up, and that I
16    had filed suit. Yep.
17 Q. When you were told that the statute of limitation
18    had expired, did you appeal that to the Seventh
19    Circuit, or to any other Court?
20 A. No, I didn't, because I -- I wasn't -- when I --
21    they sent me to -- they transferred me, so I left
22    my paperwork with a law clerk in Stateville when
23    they transferred me, and I never did get my

**Page 11**

1  paperwork back.
2  Q. When you came back in in 1997, at that time did any
3     doctor -- had any doctor told you that your arm was
4     still broken?
5  A. No, because they -- they ain't -- they told me it
6     was broken in Danville.
7  Q. I'm sorry, they told you it was broken in what?
8  A. In Danville, when I went to Danville in '98.
9  Q. When you arrived in 1998 they told you your arm was
10    still broken?
11 A. In '98? Well, I told them I had pain in my arm,
12    and he x-rayed it and said it was still broke, the
13    doctor in Danville.
14 Q. Okay. When they told you in 1998 that your arm was
15    still broken, did they treat it?
16 A. No, they ain't treat it because they transferred me
17    back to Pontiac. I told them -- I was at health
18    care to complain about my neck. I had -- a
19    softball hit me in the head and messed my neck up,
20    and I was trying to get sick call on my neck and
21    back. And I told them that my arm was still
22    broken. I was showing to them -- he told me to
23    cuff up. You know, I told him I couldn't cuff up

**Page 12**

1  because my arm was broke and I was showing it to
2  him, you know. And he jumped me. The officer
3  jumped me. And then I was explaining to him and he
4  didn't believe me.
5  Q. After Danville, has any other doctor treated you
6     because your arm was still broken, for your broken
7     arm?
8  A. No. When I -- when I went to -- when I came --
9     they transferred me to Pontiac, where it originally
10    happened at.
11 Q. Did you receive treatment for your broken arm at
12    Pontiac when you arrived back here after Danville?
13 A. Yeah. I got surgery on it again, the second
14    surgery. This happened in -- in February.
15 Q. Of what year?
16 A. '99. So it took me -- because I came back here in
17    September of '98 -- February -- September '98 --
18    1st of September, '98, and it had took them
19    February of '99.
20 Q. Did the surgery in February of 1999 fix your arm
21    then? Is it okay now?
22 A. No. It's not. It's not fixed.
23 Q. Is it still broken?

**Page 13**

1  A. Yeah.
2  Q. Has a doctor told you that?
3  A. No. The doctor -- he keeps saying it's going to
4     heal, but it's not healed.
5  Q. What doctor said it's going to heal?
6  A. Funk.
7  Q. Do you know when he told you that?
8  A. Him and that other, the one who did the surgery,
9     the second, he said it's going to take a long time.
10    There's records on it.
11 Q. Do you know when he told you that? Was it right
12    after the surgery?
13 A. Yeah.
14 Q. They told you, though, that your arm was still
15    broken?
16 A. Yeah. He said --
17 Q. Even after --
18 A. He said, you can see the fracture line. They
19    wanted to do more surgery on it, but something
20    happened in some kind of way. Then they asked for
21    an arm brace, and I never got that, so -- once they
22    find out it was still broke, you know.
23 Q. Have you ever received any treatment for your

**Page 14**

1  broken arm since February of 1999?
2  A. As to what kind of treatment?
3  Q. Any kind of treatment for your arm.
4  A. No.
5  Q. Okay.
6  A. Just when I told them that it hurts, that's it.
7  Q. Is there anything in your complaint, other than
8  complaining about lack of medical treatment for
9  your broken arm? Is that the basis of the
10  complaint that we're here talking about?
11  A. Well, yeah. Well, that's it, because I was trying
12  to get to sick call because of pain, you know. I
13  tried explain to med tech, they tell me, give —
14  let it go. So I let it go.
15  Q. So your complaint is that your broken arm has never
16  been properly treated?
17  A. Right.
18  Q. Okay.
19  A. Right.
20  Q. Can you tell me what Governor Blagojevich had to do
21  with your lack of treatment?
22  A. He's personally responsible for health care.
23  Q. The Governor is personally responsible for your

**Page 15**

1  health care?
2  A. I'm saying for the discriminate — discriminatory
3  — discriminating against me, because I — I
4  explained to him, I don't know, all the time in my
5  grievances, but they keep occurring. I've got
6  grievances that I filed, and they keep on denying
7  my grievances. So they racially discriminating
8  against me.
9  Q. Are you talking about your prison grievances that
10  you filed?
11  A. Yep.
12  Q. Did you send any of those to Governor Blagojevich?
13  A. No. I sent them to ARP, and they always have the
14  governor's name on the memo when they send it back,
15  the governor in the district. There it goes right
16  there (indicating). See, it's here. See. See
17  when they sent it back, they have it here.
18  Q. Okay.
19  A. Deny. Deny. Deny. Deny.
20  Q. You're talking about a letter you received back
21  from the administrative review board —
22  A. About my grievance.
23  Q. — denying your grievance —

**Page 16**

1  A. Right.
2  Q. — or the appeal of your grievance?
3  A. Right.
4  Q. And you're suing Governor Blagojevich and Director
5  Walker because their names are at the top of that
6  letter?
7  A. No, because — well, they signed — well, somebody
8  signed their name on the bottom of the grievance —
9  I mean the —
10  Q. Okay.
11  A. — the —
12  Q. Somebody signed the director's name at the bottom?
13  A. Yeah. You know, when you get your grievance back,
14  they always sign it concurrent. What that mean,
15  concurrent?
16  Q. Okay. Are you talking right now about the
17  grievance itself, or your appeal of the grievance
18  being denied?
19  A. Right, the appeal.
20  Q. Okay. And that letter is signed by somebody
21  signing the governor's name?
22  A. Director's name.
23  Q. I'm sorry —

**Page 17**

1  A. The director's name.
2  Q. — the director's name?
3  A. The director's name's at the bottom and the
4  governor's name's on the top of it.
5  Q. That's just — it's typed at the top of the letter?
6  A. Right. On all the grievances.
7  Q. So somebody signed the director's name at the
8  bottom?
9  A. Yeah.
10  Q. And that's the reason you're suing the two of them?
11  A. No, because their names are on this. They know
12  about it because — because they names is on the
13  letter. I don't know if they signed it, I can't
14  say, because I didn't see it. I know they is
15  responsible for the DOC, I know.
16  Q. Okay. But as far as you know, their only contact
17  with this case is that their names are on this
18  letter?
19  A. Yeah, because they responsible for anything that's
20  — you know, that's what happens.
21  Q. John Birkel?
22  A. Yeah.
23  Q. You've sued him in this case?

## Page 18

1  A. Right.
2  Q. Who is he?
3  A. He the med tech.
4  Q. Okay. When did you have contact with Mr. Birkel
5     regarding your -- the treatment of your broken arm?
6  A. Birkel?
7  Q. Yes.
8  A. When he be on the gallery.
9  Q. Is he currently a med tech who you see here at
10    Pontiac?
11 A. Yeah.
12 Q. Okay. And what has he done that's caused you to
13    see him about your broken arm, or what has he
14    failed to do?
15 A. Well, when I be in pain, you know, he don't give me
16    sick call.
17 Q. Have you ever been to the health care unit since
18    your surgery in February of 1999 because of the
19    pain in your arm?
20 A. Yeah.
21 Q. Were any of those times that Mr. Birkel referred
22    you to the doctor?
23 A. I don't remember.

## Page 19

1  Q. Okay. How many times have you told him you were in
2     pain that he refused to put you on sick call?
3  A. Plenty of times.
4  Q. I'm sorry?
5  A. A lot of times.
6  Q. Did he give you a reason why he wouldn't send you
7     to health care when you were in pain?
8  A. He said I should let it go, because I've been
9     holding on to it for too long.
10 Q. Sherry Hile?
11 A. Uh-huh.
12 Q. Who is she?
13 A. She's the ARP lady.
14 Q. Okay. She's the person who refused your appeal --
15    or denied your appeal of your grievance?
16 A. Right.
17 Q. And the grievance was asking for medical care?
18 A. Uh-huh.
19 Q. Does she have any other connection, other than
20    being the person that denied your grievance -- or
21    the appeal of your grievance?
22 A. Huh?
23 Q. Does she have any other connection with your

## Page 20

1     treatment, other than being the person that denied
2     your appeal of your grievance?
3  A. I say she personally responsible for denying it.
4  Q. Okay. She denied the grievance, but beyond that,
5     did she have any other contact or involvement with
6     your treatment?
7  A. I don't know. I can't say. I don't know if she
8     was -- when you file a grievance, she's supposed to
9     look into it. So she knows -- if she don't know,
10    she knows who is responsible for it.
11 Q. Okay. Judy Ellinger?
12 A. Uh-huh.
13 Q. Who is she?
14 A. She was the one that knew, in '91, that my arm was
15    broke. They covered it up, she knowed it. Her
16    name is Judy, she was the head nurse.
17 Q. Okay.
18 A. In '91.
19 Q. In 1991?
20 A. Yeah.
21 Q. Does she have any involvement in your treatment or
22    lack of treatment now?
23 A. Yeah.

## Page 21

1  Q. What's her --
2  A. She -- she just -- she's responsible for the med
3     techs.
4  Q. She's the med tech's supervisor?
5  A. Yep.
6  Q. And you wrote her a letter?
7  A. Yep.
8  Q. And what did you tell her?
9  A. I explained to her I needed to see sick call and
10    she -- she don't -- she don't never respond. And I
11    tell her about they denying me sick call.
12 Q. Other than covering up the attack back in 1991, and
13    not responding to your letters now, does she have
14    any other involvement in your treatment for your
15    arm?
16 A. Yeah. She responsible for any time, you have,
17    complaints, you know, you're trying to get to see
18    the doctor or orthopedic or something, she
19    responsible because she -- she's the nurse. And if
20    you explain to them -- they don't answer your
21    letters. They don't answer them. If they answer
22    them, they tell you something -- you know. It's
23    not -- she know about my arm broke, you know. She

**Page 22**

1  knows I'm having pain. She knows -- there's always
2  a time she know.
3  Q. She knows because you wrote her letters?
4  A. Yeah. And she know because she seen me. She --
5  she was there when they brought me back in '91 for
6  surgery. She was there. She knew when it
7  happened.
8  Q. Adella Jordan-Luster?
9  A. Uh-huh.
10 Q. Who is she?
11 A. She was assistant warden.
12 Q. Of programs?
13 A. Yep.
14 Q. What was her involvement with your treatment for
15 your broken arm?
16 A. She was responsible for med tech and Judy.
17 Q. She was their supervisor?
18 A. Yep.
19 Q. Other than being their supervisor, did she have any
20 other involvement with the treatment for your arm?
21 A. In what -- in what way are you saying that? Any
22 treatment?
23 Q. She supervises Judy Ellinger and the med techs,

**Page 23**

1  according to what you just said.
2  A. Right.
3  Q. Other than being their supervisor, has she had any
4  other involvement with deciding what treatment you
5  would receive or what pain medication you would
6  receive for your arm?
7  A. I'm quite certain she had something to say about
8  it. If there was a decision to be made, she would
9  have something to say, because she was assistant
10 warden.
11 Q. Are you aware of any situations in which she's made
12 a decision regarding your treatment for your arm?
13 A. I told her -- I told her -- I explained to her that
14 my arm was still broke every time. She tell me
15 that, talk to health care. And seen her over at
16 health care all the time.
17 Q. When you were in health care, you saw her there?
18 A. Yeah.
19 Q. What were you doing in health care when you saw
20 her?
21 A. I -- I was either waiting to see the doctor or --
22 or I had just come back from seeing the doctor.
23 Q. Do you have any idea how many times you've been to

**Page 24**

1  the health care unit to see a doctor since February
2  of 1999?
3  A. How many times?
4  Q. Yes.
5  A. No, I can't say how many times. I don't remember.
6  But I always complain, but it's still broke.
7  Q. You had the opportunity to see a doctor in the
8  health care unit about your arm since February of
9  1999?
10 A. Uh-huh.
11 Q. Have they prescribed any additional treatment?
12 A. No. Same old treatment, Tylenol.
13 Q. The doctor said all you need is Tylenol?
14 A. Uh-huh. Tylenol ain't going to do it. I told them
15 it's still broke.
16 Q. Did the doctor say -- did the doctor decide to
17 prescribe you Tylenol -- or only to give you
18 Tylenol?
19 A. Yep.
20 Q. Do you know which doctor that was?
21 A. No, I don't know which doctor it was, but that's
22 why I've been taking Tylenol, Tylenol, Tylenol. It
23 don't work. I've taken a bunch of them, but I

**Page 25**

1  still have pain.
2  Q. When was the last time you saw a doctor for your
3  broken arm, or for the pain in your arm?
4  A. I don't remember.
5  Q. Have you seen a doctor this year?
6  A. Yep.
7  Q. Do you know roughly how many months ago?
8  A. I got a calendar. I keep a record of every time I
9  see -- can I look at that calendar?
10 Q. Actually, right now -- we -- they're in the medical
11 records. I just wanted to know if you can tell me
12 roughly how long it's been since you've seen a
13 doctor for your arm?
14 A. Like I said, I've got to count them. I could look.
15 Q. Did you see a doctor in October for your arm?
16 A. Seen the doctor but it wasn't for my arm, it was
17 for a cold. But I haven't seen -- I got a -- I got
18 a --
19 Q. When you saw the doctor -- was it a doctor you saw
20 for your cold or was it --
21 A. Dr. Larson, he's not -- you know, I don't know what
22 he is. He's just, you know --
23 Q. Do you know when the last time you saw a doctor

```
                                  26
 1      was?
 2   A. No. I don't remember.
 3   Q. Okay. When you were in the health care unit for
 4      your cold --
 5   A. Right.
 6   Q. -- in October, did you also tell them that your arm
 7      was hurting?
 8   A. Yeah, I told them.
 9   Q. Do you know who it was that you told?
10   A. I don't know his name. I don't know his name.
11   Q. Did John Birkel ever give you Tylenol?
12   A. Did he ever give me Tylenol?
13   Q. Yes.
14   A. I don't remember. I don't remember.
15            MR. HIGGERSON: That's all I have.
16
17                  EXAMINATION
18                  BY MR. BOOKER
19   Q. You sued Dr. Funk?
20   A. Uh-huh.
21   Q. Is that a yes?
22   A. Yep.
23   Q. Is the basis of your complaint against Dr. Funk
```

```
                                  27
 1      that he only gave you Tylenol for your pain?
 2   A. He's responsible for me seeing an orthopedist or
 3      something like that, a professional -- or a bone
 4      specialist. He's the director. He knows -- he
 5      knows how long I've been taking this, and then
 6      jumped on me in 2002, May -- no.
 7   Q. Let me stop you there. The basis of your
 8      complaints against Dr. Funk is that he didn't refer
 9      you to an orthopedic surgeon?
10   A. Deliberate indifference. He was deliberate
11      indifference, because he --
12   Q. Because?
13   A. It was ongoing, you know, denying me treatment.
14      Because he denied the --
15   Q. Okay. Let me --
16   A. -- the prescribed treatment by an orthopedic
17      surgeon.
18   Q. Who?
19   A. The orthopedic surgeon's name was Sam-something.
20      Sam or something.
21   Q. When did you last see that orthopedic surgeon?
22   A. It's been a while.
23   Q. How long?
```

```
                                  28
 1   A. He --
 2   Q. Has it been in 2004?
 3   A. I haven't seen him then.
 4   Q. Has it been in 2003?
 5   A. I didn't see him in '3.
 6   Q. How about '02?
 7   A. No, I ain't seen him in '2.
 8   Q. '01?
 9   A. I think it's '01.
10   Q. Okay. What prescribed treatment did this
11      orthopedic surgeon give you in 2001, that you're
12      claiming Dr. Funk stopped?
13   A. The arm brace.
14   Q. Okay.
15   A. The arm brace.
16   Q. So let me see if I understand you. In 2001 you saw
17      an orthopedic surgeon and he said --
18   A. He did the surgery on my arm.
19   Q. Hold on. You have to let me finish. Okay?
20   A. Okay.
21   Q. In 2001 you saw an orthopedic surgeon; is that
22      right?
23   A. He said it was still broke.
```

```
                                  29
 1   Q. Now, did you get the arm brace after you had your
 2      surgery?
 3   A. I never got no arm brace.
 4   Q. When did you have your surgery, in '99?
 5   A. In '99. He -- the orthopedic prescribed an arm
 6      brace. I never did get it.
 7   Q. Okay. So after your surgery in 1999, this
 8      orthopedic surgeon said you needed an arm brace,
 9      right? Is that right?
10   A. Yes.
11   Q. You came back here to Pontiac and they didn't give
12      you an arm brace?
13   A. No.
14   Q. And that's the basis of your complaint against Dr.
15      Funk; is that right?
16   A. No. He was -- he denied -- he denied prescribed
17      treatment. Whatever the doctor prescribed, he
18      didn't --
19   Q. Okay. I'm asking you, though, when you say
20      prescribed treatment, are you talking about the arm
21      brace?
22   A. Whatever he prescribed.
23   Q. Tell me what that means.
```

## Page 30

1  A. He asked for another surgery.
2  Q. Okay. So now you say there was supposed to be an
3     arm brace that you didn't get and there was another
4     surgery?
5  A. Right.
6  Q. And Dr. Funk said, no, you couldn't have the
7     surgery?
8  A. Yeah.
9  Q. And when did he say that?
10 A. In 2001.
11 Q. In 2001?
12 A. Right. He said it was going to heal.
13 Q. All right. And you don't remember that orthopedic
14    surgeon's name, as you sit here today?
15 A. It starts with S. S — S — I might have his name
16    here.
17 Q. That's okay, I can look for it in the record.
18 A. His name was — S or something. S-i-n or
19    something.
20 Q. Okay. All right. You don't have to look for it
21    now.
22 A. I think that's his name.
23 Q. So other than the additional surgery and the arm

## Page 31

1  brace, is there anything else that you say Dr. Funk
2  didn't let happen or did wrong?
3  A. Because, see, he didn't — he didn't explain to
4     them how to cuff me up, because my, you know, my
5     arm is broke. And they keep cuffing me up from the
6     back. And he not — he just don't care, man.
7  Q. He just what?
8  A. He don't care because he don't prescribe — he took
9     away — he only gave — he gave — he only ordered
10    a permit, an arm permit, for about two months or
11    something like that.
12 Q. So he did give you some kind of permit for a couple
13    of months for your arm, true?
14 A. Yeah. He — he — I think he did. I think that
15    was him doing it, I don't know. I can't say.
16 Q. You've seen other doctors other than Dr. Funk,
17    haven't you?
18 A. For my arm?
19 Q. Yeah, since 2001.
20 A. Yeah.
21 Q. Have we talked about all of your complaints against
22    Dr. Funk? Is there anything else that we haven't
23    talked about?

## Page 32

1  A. Well —
2  Q. You said the other surgery and the arm brace, and
3     some kind of permit. Is there anything else?
4  A. The — the treatment that I'm receiving from the
5     med techs. They don't — you know, they ignore my
6     complaints, you know what I'm saying? You know,
7     like if I said, I need to see the doctor.
8  Q. Did Dr. Funk ever refuse to see you?
9  A. Yes.
10 Q. When?
11 A. I wrote him — I wrote him plenty of times. I
12    never got no response.
13       MR. BOOKER: Can we go off the record.
14       (A discussion was had off the record.)
15       MR. BOOKER: Okay. Back on.
16 BY MR. BOOKER:
17 Q. Anything else against Dr. Funk? Have we talked
18    about all of your complaints against Dr. Funk?
19 A. What do you mean?
20 Q. Well, let me ask it this way. You're suing Dr.
21    Funk, right?
22 A. Uh-huh.
23 Q. Is that a yes?

## Page 33

1  A. Yes.
2  Q. You're saying that he was deliberately indifferent
3     to a serious medical need; is that right?
4  A. Yeah.
5  Q. The serious medical needs that you're complaining
6     of is this pain from the broken arm; is that right?
7  A. He knew —
8  Q. Just answer my question. Is that right?
9  A. I can't — I don't understand what you're saying.
10 Q. Okay. Let me say it again. The serious medical
11    needs that you say Dr. Funk was indifferent
12    about —
13 A. Uh-huh.
14 Q. — is your broken arm, true?
15 A. Uh-huh.
16 Q. Is that a yes?
17 A. Yes.
18 Q. You have to say yes or no. You can't say uh-huh or
19    huh-uh.
20 A. Yes. I'm saying yes is the indifference, because
21    of my medical — medical treatment.
22 Q. Okay. And medical treatment over your arm?
23 A. Right.

```
                                    34
 1   Q. Right?
 2   A. Improper medical treatment.
 3   Q. Over your arm?
 4   A. Yeah, my broken arm.
 5   Q. No other part of your body, just your arm is what
 6      you're complaining about today, true?
 7   A. Well, medical treatment because I got broke -- I
 8      got cut up, too, one time and they didn't treat me
 9      for it then, for my own medical cut. They cut my
10      arm, my leg, with the shackles and stuff, and they
11      denied me treatment for that, too.
12   Q. When was that?
13   A. May 20, 2002.
14   Q. And you're saying Dr. Funk didn't treat you for
15      that?
16   A. No.
17   Q. In the complaint that you filed, you wrote out --
18      you didn't say anything about that, though, did
19      you?
20   A. What?
21   Q. About cutting up your arms.
22   A. I didn't cut up my arms, they did that. The police
23      did that.
```

```
                                    35
 1   Q. You didn't say anything in your complaint about Dr.
 2      Funk not treating you for those cuts, did you?
 3   A. I said in my complaint -- I said 5/20.
 4   Q. You said what?
 5   A. That's when it happened, on 5/20. I explained
 6      that's when it happened, when my arm's still broken
 7      they -- medical treatment period on 5/20, that I
 8      had.
 9   Q. Have we talked about all the things that you're
10      suing Dr. Funk over? Is there anything else?
11   A. My medical treatment, period.
12   Q. Hold on, let me ask you this question, because you
13      can't just say medical treatment. That doesn't
14      mean anything.
15   A. I didn't --
16   Q. Hold on. I have to know specifically what you're
17      talking about. And that's what I'm asking you.
18      Have we talked about all the specific things?
19   A. Well, I'm talking about Dr. Funk treating me,
20      period.
21   Q. For --
22   A. When I asked him, you know, any time something, you
23      know, related to Larry Young has been denied. I
```

```
                                    36
 1      mean, you know, because they don't know, you know.
 2      It's true.
 3   Q. Let me stop you there. Is there anything else
 4      specifically about the medical care Dr. Funk
 5      provided to you that you have a problem with, other
 6      than the things we already talked about? Is there
 7      anything else we haven't already talked about? Do
 8      you understand that question?
 9   A. Yeah. My health. I've been -- you know, like I
10      have a broken hip, I have back pain and stuff too.
11      I had hip surgery, so I know -- he seen x-rays when
12      I fell and slipped on ice, and I didn't get no
13      medical treatment.
14   Q. And you're saying Dr. Funk did that, too?
15   A. Yeah.
16   Q. Has Dr. Funk treated you for other things --
17   A. Yeah.
18   Q. -- when you're --
19   A. When I slipped and fell on ice, they brought me
20      back into the hospital.
21   Q. When was that?
22   A. When my arm -- my arm was -- before I even had
23      surgery on my arm.
```

```
                                    37
 1   Q. Did you ever file a grievance over that?
 2   A. Yeah.
 3   Q. What happened to it?
 4   A. Still, they always sweep it under the rug. They
 5      deny it, mmm.
 6   Q. Have you talked about all the things that you're
 7      complaining of about Dr. Funk? We talked about
 8      your arm, we talked about --
 9   A. I talked to --
10   Q. Hold on. Hold on. We talked about your arm, we
11      talked about your arm brace, we talked about the
12      med techs not letting you see Dr. Funk, we talked
13      about the pain in your back after you fell, we
14      talked about cuts and scrapes from something that
15      happened in 2001. Is there anything else, other
16      than those things?
17   A. Huh?
18   Q. Have we talked about all those things?
19   A. Well, I haven't talked about it to him.
20   Q. No. I'm asking you, what's the basis of your
21      lawsuit? I need to know what you're complaining
22      about.
23   A. I'm complaining about my broken arm. My still
```

## Page 38

1  broken arm. Because after -- after they jumped on
2  me on the 20th, they tried to cover that up, you
3  know, like they covered up the first time they
4  covered up the broken arm.
5  Q. Dr. Funk covered that up?
6  A. Yeah.
7  Q. All right.
8  A. He's responsible for -- the med techs already said
9  that I salted the steps. I never salted no steps.
10 Q. Do you know when the last time you saw Dr. Funk
11    was?
12 A. The last time I saw Dr. Funk was --
13 Q. I'm just asking if you know.
14 A. Yeah, I know. I'm going to tell you when was the
15    last time I saw him. It was when -- when I had
16    that -- I asked for -- they sent me a letter
17    telling me about medical record staff got in my
18    records, medical records.
19 Q. So you don't know when the last time you saw him
20    was without looking at your papers, right?
21 A. No, I can't remember. But I know I saw him,
22    though. But I can't remember. I got it on the
23    paperwork here.

## Page 39

1  Q. That's okay. I'm only interested in what you
2     remember right now.
3  A. I'm trying to see what day it was.
4  Q. Are you taking any medications right now?
5  A. No.
6  Q. Did you take any medication --
7  A. That's the day it was. It was --
8  Q. We can get copies of all of that paperwork. I'm
9     not interested in that right now. Are you taking
10    any medications right now?
11 A. No, nothing but Tylenol and cold tablets.
12 Q. Have you understood all the questions I've asked
13    you today?
14 A. No. I don't understand them, but I've tried
15    answering them the best I can.
16 Q. Do you know what questions you didn't understand?
17 A. All of them. All of them, really.
18 Q. Do you know what today's date is?
19 A. No. What is today?
20 Q. Do you know what year it is?
21 A. Yeah.
22 Q. What year is it?
23 A. 2003.

## Page 40

1  Q. All right.
2  A. Hang on, 2004.
3  Q. Do you know what month it is right now?
4  A. October -- I mean November.
5      MR. BOOKER: All right. That's all the
6  questions I have.
7      MR. HIGGERSON: Just a couple of
8  follow-ups.
9
10           FURTHER EXAMINATION
11           BY MR. HIGGERSON
12 Q. You mentioned an incident of 5/20 of 2001?
13 A. Yep.
14 Q. You say the med techs say you assaulted a staff?
15 A. Yeah.
16 Q. Were you disciplined for that?
17 A. Huh?
18 Q. I'm sorry?
19 A. Was I disciplined?
20 Q. Yes. Did you receive a ticket for that?
21 A. Yeah, I received a ticket for that. I was cuffed
22    up and then they gave me four years for that, too.
23 Q. You lost -- you got a four-year new sentence?

## Page 41

1  A. Right.
2  Q. For assaulting staff?
3  A. Yeah.
4  Q. And you say the med techs covered it up on that
5     day?
6  A. They didn't -- they wouldn't come see me. They
7     didn't do nothing. They didn't take pictures of my
8     arm or the cuts on my arm or my legs.
9  Q. Okay. You mentioned that you have records of every
10    time you've seen a doctor. Did you also make
11    notes --
12 A. This year.
13 Q. Just this year?
14 A. Yeah. I didn't do it last year. But they got
15    destroyed.
16 Q. Did you also keep records of when you asked for
17    medical care from the med techs and were refused?
18 A. Yeah.
19 Q. Is that the same sheet you marked on there when you
20    asked for medical care and were told no?
21 A. Huh?
22 Q. Is that the same one set of records that you either
23    marked that you got medical care or that you asked

```
                                                    42
 1       for medical care and were refused all in one group
 2       of documents?
 3    A. I don't understand what you're saying. They
 4       refused --
 5    Q. How many pages are your records of when you got to
 6       see a doctor or when you were refused?
 7    A. There you go right there. It's a calendar.
 8    Q. Okay. So a calendar for this year with injuries on
 9       each date?
10    A. Uh-huh.
11       MR. BOOKER: Is that a yes?
12       THE WITNESS: Yes. I've got a calendar.
13       I marked on when I asked -- when I explained to
14       them -- every time I seen a med tech I explained to
15       them, my arm is broken, I need something for pain.
16       So I explained to them, you know what I'm saying,
17       and they refused it, so I just write it down.
18       MR. HIGGERSON: Okay. That's all the
19       questions I have.
20       (Further deponent saith not.)
21       (Signature reserved.)
22
23
```

```
                                                     43
 1  STATE OF ILLINOIS    )
                         ) SS.
 2  COUNTY OF WOODFORD   )
 3           CERTIFICATE
 4     I, Lisa Doerr, CSR, License #084-004304, DO
    HEREBY CERTIFY that, pursuant to notice, there came
 5  before me on the 3rd day of November, A.D. 2004, at
    700 West Lincoln Street, Pontiac Illinois, the
 6  following named person to wit:
              LARRY YOUNG,
 7  who was by me first duly sworn to testify to the
    truth and nothing but the truth of his knowledge
 8  touching and concerning the matters in controversy
    in this cause and that he was thereupon carefully
 9  examined upon his oath, and his examination
    immediately reduced to shorthand by means of
10  stenotype by me.
       I ALSO CERTIFY that the deposition is a true
11  record of the testimony given by the witness, that
    the reading and signing of the deposition by the
12  said witness were expressly reserved, but that the
    necessity of calling the court reporter at time of
13  trial for the purpose of authenticating said
    transcript was waived.
14     I FURTHER CERTIFY that I am neither attorney
    nor counsel for, nor related to, nor employed by,
15  any of the parties to the action in which this
    deposition is taken, and, further, that I am not a
16  relative or employee of any attorney or counsel
    employed by the parties hereto, or financially
17  interested in the action.
       IN WITNESS WHEREOF, I have hereunto set my hand
18  this 11th day of November, A.D. 2004.
19
20         [signature: Lisa Doerr]
21         CSR License #084-004304
22
23
```

```
                                                      44
 1           UNITED STATES DISTRICT COURT
         FOR THE CENTRAL DISTRICT OF ILLINOIS
 2                  PEORIA DIVISION
 3
 4  LARRY YOUNG,          )
                          )
 5     Plaintiff,         )
                          )
 6     vs.                )  No. 03-1362
                          )
 7  CRAIG FINDLEY, et al.,)
                          )
 8     Defendant.         )
 9           DEPONENT'S CERTIFICATE
10
        I, LARRY YOUNG, having been first duly sworn on
11  oath, state that I have read the foregoing
    transcript of the testimony given by me and that
12  said transcript constitutes a true and correct
    record of the testimony given by me at said
13  deposition, except as I have so indicated on the
    errata sheets provided herein for such.
14
15  _____
              Deponent
16
17  No corrections (please
18  initial): _____
    Number of errata sheets
19  submitted: _____
20
21  SUBSCRIBED AND SWORN TO before me this
22  _____ day of _____, 2004.
23
```

```
                                                      45
 1              ERRATA SHEET
 2  PAGE   LINE   CHANGE         REASON
 3  ____   ____   _____   _____
 4  ____   ____   _____   _____
 ...
23
```

## DECATUR MEMORIAL HOSPITAL
2300 N. EDWARD STREET
DECATUR, ILLINOIS 62526

### PATIENT INFORMATION

| ACCOUNT NO. | | ACC. CODE | ROOM BED | UNIT NO. |
|---|---|---|---|---|
| 0509000927 | | | - | 0000265701 |

| PAT. TYPE | D.O.B. | AGE | SEX | MS | PAT. CLASS | FC | RACE | SMOKER | DATE | TIME |
|---|---|---|---|---|---|---|---|---|---|---|
| O/P | 10/23/55 | 49Y | M | S | | PP | 2 | UNK | 03/31/05 | 1423 |

**\*\*\* PATIENT DATA \*\*\***

YOUNG, LARRY
700 W LINCOLN ST  POB 99
PONTIAC CORRECTIONAL
PONTIAC    IL  61764

HOME: (815)842-2816    WORK: (217)000-0000
S.S #: XXX-XX-4594

**\*\*\* EMERGENCY DATA \*\*\***

RELATIVE 1: WARDEN    S.S #: XXX-XX-
RELATION:    PIERCE, GUY
700 W LINCOLN ST  POB 99
PONTIAC    IL  61764

HOME: (815)842-2816    WORK: (815)842-2816
RETIRE DATE:

**\*\*\* INSURANCE #1 \*\*\***

WEXFORD/PONTIAC CORR CENTER
PO BOX 16218
PITTSBURG    PA    15242-0218
PONTIAC COR

353504594
INS.CODE    PRE-ADM CERT.    VERIFY
872407

**\*\*\* GUARANTOR DATA \*\*\***

RELATION:    SELF
YOUNG, LARRY
700 W LINCOLN ST  POB 99
D0000265701
PONTIAC    IL 61764

D.O.B. 10/23/55    S.S #: XXX-XX-4594
HOME: (815)842-2816    WORK: (217)000-0000

**\*\*\* INSURANCE #2 \*\*\***

Grp:

INS.CODE    PRE-ADM CERT.    VERIFY

**\*\*\* EMPLOYER \*\*\***

PATIENT:    GUARANTOR:
NONE    NONE
-    -
PONTIAC    IL    PONTIAC    IL
61764    61764
RETIRE DATE:    RETIRE DATE:

**\*\*\* MISCELLANEOUS \*\*\***

INS #3:
ALLERGIES:
ARRIVAL MODE:
ADM. SOURCE:
OCCUPATION: NONE
CHURCH: DENOMINATION CONFIDENTIA

**\*\*\* PATIENT MISC \*\*\***

ADM: VERMA, AJAY    PCP: FUNK, ARTHUR
REF: LARSON, DENNIS P
ATT: VERMA, AJAY
ACC: NO    ACC. DATE:    TIME:
ACCIDENT TYPE:    PUB: n
SERVICE: PUL
ROUTING:    BY: VSG

ADMITTING DIAGNOSIS: PARATRACHEAL MASS
PARATRACHEAL MASS

COMMENTS:
LUNG CENTER/REG IN PERSON 033105

Advanced Directives: NAD    Organ Donor:



PATIENT COPY

